UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-------------------------------------------------------------------x
UNITED STATES OF AMERICA :
:
v. : Docket No.
: 3:02CR00379(AHN)
COSMO CORIGLIANO, : January 24, 2007
Defendant. :
-------------------------------------------------------------------x


# DEFENDANT COSMO CORIGLIANO'S SENTENCING MEMORANDUM

Gary P. Naftalis, Esq.
Alan R. Friedman, Esq.
Eric A. Tirschwell, Esq.
KRAMER LEVIN NAFTALIS AND FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

Ira Grudberg, Esq.
JACOBS, GRUDBERG, BELT, DOW & KATZ P.C.
350 Orange Street
New Haven, CT 06511
(203) 772-3100

*Attorneys for Defendant Cosmo Corigliano*

TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................. 1

II.     SENTENCING FRAMEWORK ......................................................................... 4

III.    ANALYSIS OF THE § 3553(a) FACTORS ..................................................... 5

        A.      Section 3553(a)(1) ............................................................................. 5

                1.      History and Characteristics of Cosmo Corigliano ...................... 5

                2.      Mr. Corigliano's Successful Business-Building ........................ 7

                3.      Cosmo Corigliano's Extraordinary Cooperation ...................... 10

                4.      The Nature and Circumstances of the Offense ........................ 12

        B.      Sections 3553(a)(2)(A)-(a)(2)(C): Reflecting the Seriousness of the
                Offense, Punishment, Promoting Respect for the Law,  Deterrence and
                Protecting the Public.......................................................................... 14

        C.      Section 3553(a)(3): The Kinds Of Sentences Available ...................... 19

        D.      Sections 3553(a)(4) and (a)(5): The Sentencing Guidelines ................ 20

IV.     A NON-INCARCERATORY SENTENCE WITH STRICT CONDITIONS
        OF HOME CONFINEMENT AND COMMUNITY SERVICE  IS APPROPRIATE,
        REASONABLE AND SUFFICIENT TO ACHIEVE THE SENTENCING GOALS
        THAT CONGRESS ENUMERATED........................................................................ 21

## TABLE OF AUTHORITIES

### CASES

*United States v. Booker,*
  125 S. Ct. 738 (2005) ..................................................................................................4

*United States v. Crosby,*
  397 F.3d 103 (2d Cir. 2005) ......................................................................................4

*United States v. Fleming,*
  397 F.3d 95 (2d Cir. 2005) ........................................................................................4

### STATUTES

18 U.S.C. § 371 ....................................................................................................... 19 n.8

18 U.S.C. § 1343 ..................................................................................................... 19 n.8

18 U.S.C. § 3553(a) ..................................................................................................*passim*

18 U.S.C. § 3559 ..................................................................................................... 19 n.8

18 U.S.C. § 3561 ..................................................................................................... 19 n.8

18 U.S.C. § 3565(a)(2) ................................................................................................ 18

U.S.S.G. § 5k1.1 ............................................................................................................ 2

U.S.S.G. § 2F1.1(b)(1)(S) .......................................................................................... 20

### OTHER

Comments of Prof. William Stuntz, Harvard Law Bulletin, Summer 2005, at 17 .................... 4 n.1

Nat'l Institute of Justice, U.S. Dep't of Justice, *Intermediate Sanctions in Sentencing*
  *Guidelines* 11 (May 1997) .................................................................................. 20 n.9

Office of Prob. & Pretrial Servs., Admin. Office of U.S. Courts, *Court & Community:*
  *An Information Series About U.S. Probation & Pretrial Services* (2005) .............. 18, 22 n.10

*SEC Settles With Former CFO of CUC International Inc. For His Role In Financial*
  *Fraud At CUC And Cendant Corporation,* SEC Litigation Release No. 18711, 82
  S.E.C. Docket 3221, Release No. AE-2014, 2004 WL 1086015 (May 14, 2004) .......... 15 n.5

We respectfully submit this sentencing memorandum on behalf of Cosmo Corigliano, who is scheduled for sentencing by this Court on January 30, 2007.

## I.    INTRODUCTION

For more than seven years, Cosmo Corigliano has provided not just "substantial" but "extraordinary" and "indispensable" assistance to the United States Government in its investigation and prosecution of the former chief executive and chief operating officers of CUC International – convicted defendants Walter Forbes and Kirk Shelton. Indeed, we are aware of few if any cooperating witnesses who have *ever* provided greater assistance to the United States Government in a corporate fraud case – in quality, quantity, importance, and duration – than Mr. Corigliano has provided here.

For almost nine years since the fraud became public, Mr. Corigliano and his family have lived day-in and day-out with great uncertainty and profound anxiety about what would happen when it came time for sentencing, which is now set nearly a decade after he committed the offenses for which he has accepted responsibility. During this period, Mr. Corigliano agreed to disgorge to the government millions of dollars of his family's assets; he surrendered his CPA license; he was barred from serving as an officer or director of a public company; and he and his family have suffered the shame and humiliation of being shunned by friends and neighbors exposed to the massive publicity surrounding this case.

Your Honor now has the solemn and daunting responsibility of determining a sentence that appropriately balances the admitted seriousness of Mr. Corigliano's criminal participation against the unprecedented level of his cooperation, the punishments and deprivations that he already has endured, and his compelling personal circumstances. To assist

KL3 2569132.2

1

the Court in this difficult task, we address below the sentencing considerations laid out in 18

U.S.C. § 3553(a), highlighting what we believe to be the most relevant facts and arguments.

Chief among these factors is of course Mr. Corigliano's extraordinary acceptance

of responsibility and commitment to making amends for his admitted wrongdoing as evidenced

by the "nature, extent, and significance" (USSG § 5K1.1) of his cooperation with and assistance

to the government, including:

- Attending as many as 100 multi-hour meetings with federal officials, and spending hundreds of additional hours traveling thousands of miles back and forth between Connecticut and New Jersey and New York to do so, far exceeding the time and effort expended by any other cooperator in this case to help the government build its cases and prepare for three separate trials, including educating three sets of prosecutors and two separate trial teams.

- Testifying in court for 28 days over the course of three trials, including 20 days of relentless and even vicious cross-examination about both his professional and personal life, again far in excess of any other cooperating witness in this case (or, so far as we are aware, any other case).

- Disgorging to the government assets valued at some $14 million, representing the vast bulk of his family's net worth acquired over fifteen years of work, and an amount greater than his unjust enrichment based on his trading in CUC/Cendant stock, without giving him credit for the substantial taxes he paid on his gains.

- To a degree unequaled by any other cooperating witness, bringing teams of federal prosecutors and law enforcement agents, and later three separate

2

juries, inside the "executive area" at the offices of CUC/Cendant, where the multi-billion dollar accounting fraud was conceived, directed and discussed by and among Walter Forbes, Kirk Shelton and Stu Bell.

- Being consistently described in all three trials by lawyers for both the prosecution and defense as the single most important witness in the cases against defendants Forbes and Shelton.

By reciting these facts we do not intend in any way to denigrate or minimize the importance of the contributions made by other cooperating witnesses in the chain of events giving rise to the government's successful prosecutions of the most culpable and most senior participants in the CUC/Cendant accounting fraud: defendants Forbes and Shelton. But when it comes to the sheer magnitude and substantiality of the assistance actually rendered, we most respectfully submit that Mr. Corigliano's efforts and contributions stand alone and apart, and have been uniquely important in this case. Because of this, we ask Your Honor to depart or deviate from Mr. Corigliano's stipulated Guidelines range of 78 to 97 months imprisonment to a degree and extent commensurate with the unique and extraordinary substantiality of the cooperation he has rendered.

Stated more concretely, we respectfully submit that a full consideration of all of the § 3553(a) factors – including Mr. Corigliano's personal history and characteristics, his *seven years* of extraordinary cooperation and assistance, the *nine years* of uncertainty he has lived with since the accounting fraud at CUC/Cendant was first exposed, and the other ways in which he already has been punished and subjected to financial penalties – counsel strongly in favor of completing Mr. Corigliano's punishment with a non-incarceratory sentence that includes strict house arrest and community service, a sentence that we submit would be "sufficient, but not

3

greater than necessary," to comply with the purposes of sentencing, and a request that the government, at the time of Mr. Corigliano's plea, agreed not to oppose (Plea Stipulation #10).

## II.    SENTENCING FRAMEWORK

Following *United States v. Booker*, 543 U.S. 220, 227 (2005), and as Your Honor of course is well aware, to arrive at a just and "reasonable" sentence the sentencing court now "must consider the Guidelines *and* all of the other factors listed in section 3553(a) [of Title 18]." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) (emphasis added).

The Second Circuit has stated that it will "not prescribe any formulation a sentencing judge will be obliged to follow in order to demonstrate discharge of the duty to 'consider' the Guidelines." *Id.* at 113.   In *United States v. Fleming*, 397 F.3d 95, 100 (2d Cir. 2005), the Court further explained that it would accept that the requisite consideration of the Guidelines has occurred as long as the judge was "aware" of the sentencing range or ranges arguably applicable, and then, having looked at all of the other § 3553(a) factors, imposed a sentence that was not unreasonable.

While the district courts have adopted a range of approaches to weighing the § 3553(a) factors, including the Guidelines, there is widespread agreement that in the aftermath of *Booker* the new federal sentencing regime – aptly described by one law professor as a system of "rules moderated by mercy"[1] – now entrusts district judges with a sufficient degree of added discretion to achieve "more individualized justice." *Crosby*, 397 F.3d at 114.

---

[1] Comments of Prof. William Stuntz, Harvard Law Bulletin, Summer 2005, at 17.

III.    **ANALYSIS OF THE § 3553(a) FACTORS**

    A.    **Section 3553(a)(1)**

        1.    History and Characteristics of Cosmo Corigliano

As accurately reflected in the PSR, and spelled out in much greater detail in the many letters from family and friends[2] and Mr. Corigliano's own written personal statement to Probation,[3] Mr. Corigliano comes from a modest, working-class background and, apart from his conduct at CUC/Cendant, has led a law-abiding and admirable life as a devoted husband, father, son, son-in-law, brother, brother-in-law, uncle and reliable friend, and also has been a contributing member of his community and an entrepreneur building up businesses and creating jobs in his home state of Connecticut.

Whether it's driving for hours day after day to be by the bedside of a sick or aged parent, being the only adult to volunteer to coach his children's basketball team despite his own lack of sports prowess, taking infirm relatives into his family's home at times of need, or even dedicatedly supporting his struggling actress niece's aspirations to Broadway, the words used to describe Mr. Corigliano by those who know him best paint a vivid and consistent picture of a man who is "thoughtful," "caring," "sincere," "genuine," "humble," "soft-spoken," "loving," "generous," "loyal" and "kind."

As the letter from his wife Terri Corigliano attests, and others – including his oldest son David – confirm, Cosmo has been and continues to be an indispensable contributor to the happiness and well-being of his family. His son David lovingly writes that his father is a

---

[2] The original copies of these letters have been sent directly to Senior Probation Officer Lopez for transmission to the Court.

[3] We understand this personal statement will be attached to the Presentence Report for transmission to the Court.

daily and critically important presence in the lives of his children. Not surprisingly, both Mrs. Corigliano and other family members express genuine and heart-felt concern about the physical and emotional disruption and loss to the family should Mr. Corigliano be separated from his children – Michael, age 12, Mary, age 14, and David, age 16 – in these formative and critical teenage years.

Mr. Corigliano also has been and continues to be a vital and primary source of both emotional and financial support to his father, now 78 years old, as well as his elderly mother-in-law. As his sister Nancy DeNicola describes, Mr. Corigliano "has been critical in helping [our] father, physically, emotionally and financially," in handling the recent "unbearable loss" of his wife, Cosmo's mother. "No matter how stressful [Cosmo's] life," Ms. DeNicola continues, he "always will make time to visit, call and make sure my father is as comfortable as possible. Cosmo actually downplays his situation to alleviate further stress on my father." With respect to his father in particular, who by all accounts relies and depends heavily and primarily on his only son, Cosmo, there is real concern that a separation may – in the words of Mr. Corigliano's brother-in-law Mark MacKeil – amount to a "devastating blow."

Another important theme running through the letters from friends and family is the genuine remorse and humility with which Mr. Corigliano has confronted, accepted and dealt with his involvement in the unlawful conduct at CUC/Cendant. As a cousin, Gerard DeMarco, writes: "Cosmo took responsibility for his actions early on. Cosmo never complained about his situation. . . . He has dealt with the situation by looking and moving forward, putting the past behind him." Or in the words of his sister-in-law, Dr. Mary-Louise Scully, "importantly, Cosmo has avoided the bitterness and anger that so often develop in those who experience a bitter ordeal." His wife Terri reports that Cosmo "always kept it to be as much of 'his' problem alone

6

as he could and that has made it so much easier for me and our family." And she explains how, despite all that was required of him as the lead cooperating witness in a major government investigation and prosecution that has spanned nearly a decade, he carried on with his personal life and his responsibilities with quiet dignity and perseverance:

> I have watched him commute whenever and wherever the government attorneys and his attorneys needed him to go for over seven years – amidst the illness and death of his mother, illnesses of my mother, family problems, and literally hundreds of hours in traffic to get back to Old Saybrook. Even after a nerve-racking [sic] day of testifying and enduring cross-examination by some of the country's top defense attorneys, Cosmo would come home and then drive to basketball games, wrestling matches, crew races, or wherever the family happened to be.

Mr. Corigliano's own words, submitted in an essay requested by Senior Probation Officer Lopez, reflect a continuing, detailed and direct acknowledgment of full responsibility for his actions: (a) "I truly regret my actions" and recognize "how wrong it was to participate in this fraud;" (b) "[t]he single biggest mistake of my life was going along with this approach to business;" (c) "I am truly sorry for being a part of this and I wish that at the time I had more of a sense of independence to have stepped away and not to have been such a willing participant."

## 2.    Mr. Corigliano's Successful Business-Building

As part of the process of "moving on," and after he was forced in April 1998 to leave the company he had worked for since the young age of 23, Mr. Corigliano quickly set his mind to re-directing his skills and experience into building a small company of his own. By the middle of 1999, the Coriglianos had purchased Crystal Journey Candles, at the time a small candle manufacturer run out of the prior owner's garage. Less then eight years later, Mr. Corigliano and his employees have grown Crystal Journey to a national candle manufacturing

company with 25 employees (including Mr. Corigliano), operating out of approximately 15,000 square feet of space in Essex, Connecticut.[4]

Mr. Corigliano's stewardship of Crystal Journey Candles has been characterized by the highest of business standards. As Crystal Journey Vice President for Production Timothy Raymond describes in his letter to the Court, Mr. Corigliano "is highly respected and beloved by the people who work for and with him;" he consistently has treated his employees with "respect and dignity;" he "works very hard" and with "very little ego;" he "takes very seriously his social responsibility of watching over the employees . . . [and] giving them a safe, secure and respectful place of employment;" he "strongly believe[s] that family comes first and that ideal permeated throughout the organization;" and, he has "take[n] an active interest in the lives of the people that work for him and they appreciate him for that."

In the words of his employees, who were eager to submit their own letters in support of their boss, Mr. Corigliano: "We all agree he is an honest and generous employer;" "Cosmo is most probably the best boss I have ever had. Kind, patient, Completely understanding in the phase [sic] of family crisis, extremely Professional and simply an all around great guy;" "Crystal Journey Candles is a small family business and, and Cosmo has made us all seem like part of his extended family;" "In October 2005 I was diagnosed with breast cancer, and had to take some time off. . .he [Cosmo] so understood what I was going thru and the whole Company has made the last year just wonderful for me;" "Several months ago, my father had a very serious heart operation. Cosmo told me not to worry about things here and that I was free to take the amount of time off that I needed to be with my Dad;" "On June 16, 2006, when I found myself in

---

[4] *See* www.crystaljourneycandles.com.

KL3 2569132.2

the hospital getting ready for surgery Cosmo took the time to tell me, 'from one coward to another,' he said 'every thing will be OK.' He had the same operation."

In what perhaps is the most telling testament to the loyalty, respect and devotion that Mr. Corigliano has inspired in his employees, his wife Terri reports that, on the day he had to take the necessary but humiliating step of telling his employees that he soon would be turning over the company he had nurtured and grown for five years to a court-appointed receiver because of his prior misdeeds, a box labeled "Applications for Cosmo's New Company" was quickly created and was "filled within the hour."

By all accounts Mr. Corigliano has been the single and critical person essential to the growth of Crystal Journey up until July 2004, as well as its continuing viability after that date, when it was turned over to the Court-appointed Receiver as part of the Coriglianos' SEC settlement. While he formally bears the title President, Mr. Corigliano wears almost every important leadership hat at the company, i.e., marketing and sales (including new product development), accounting and administrative/human resources.

At its peak in 2003/2004, and under Mr. Corigliano's leadership, Crystal Journey achieved annual sales of over $2.5 million. Since the Coriglianos turned over the Candle Company in 2004, the Receiver has asked Mr. Corigliano to remain on and run the company. Mr. Corigliano has cooperated fully with the Receiver in running the company, including by taking a substantial pay cut to offset the company's more recent decline in sales. Tr. 10/19/06, at 2328-29. Most recently, Mr. Corigliano and his wife have continued to work with the Receiver to devise options to assure that the candle company remains in Connecticut on a long-term basis, set it back on a path to growth and profitability and ensure the continuity of the jobs of its roughly 25 employees.

9

KL3 2569132.2

As the PSR also notes, following the turn-over of Crystal Journey to the Receiver in 2004, the Coriglianos again re-focused and purchased another small company, "4allpromos.com." In a little less than two years, Mr. Corigliano and his business partner Mr. Raymond have increased sales of that company from $300,000 to an expected $1,000,000 annually, and now employ four employees other than themselves (two full-time, two part-time). However, the young company has yet to turn a profit or provide any income to Mr. Corigliano or his wife.

3.    Cosmo Corigliano's Extraordinary Cooperation

The Court will recall the vital statistics – 7 years of cooperation, as many as 100 meetings with federal officials from various agencies, 3 trials in three consecutive years, educating 3 different teams of prosecutors, and 28 days on the witness stand, including 20 days of withering and relentless cross-examination about nearly every aspect of both his professional and personal lives. While the numbers alone may be impressive and even mind-boggling, they tell only a tiny part of the story of Mr. Corigliano's extraordinary cooperation.

For the details, we defer largely to the government's 5K1.1 motion, filed under seal and comprehensively describing the extraordinary and indispensable assistance – in both quality and quantity – that Mr. Corigliano provided to the government in its investigations and successful prosecutions of defendants Forbes and Shelton.

We note as well the highly unusual fact that the government's attestation in the 5K1.1 motion to the extraordinary assistance rendered by Mr. Corigliano – and the ways in which Mr. Corigliano's cooperation really stands apart and above, in a category of its own – is reinforced here not just by input provided by the lead prosecutors from the investigation and first

10

trial, former AUSAs Paul Weissmann and John Carney, but also by a separate and highly

detailed letter from the original lead case agent, former FBI Special Agent Mark Gerber.

Former FBI agent Gerber compellingly explains: how "[w]e needed someone on

the inside who was in the meetings when the fraud was discussed to step forward and cooperate

and tell the story and bring the documents to life;" that "Corigliano was the key that opened the

door to the inside of the fraud" and "was able to figuratively put" Forbes and Shelton "at the

table;" "Cosmo worked extremely hard with us in putting our case together, and I found him to

be truthful about his involvement and the roles played by others;" how "he never sugar coated

his involvement in the fraud," showed "genuine remorse, [and] accepted responsibility for his

actions;" and has "taken extraordinary steps to cooperate faithfully through an incredibly long

investigative and judicial process complicated by the changing of the United States Attorney's

team on three separate occasions over three trials."

Critically, both the original lead prosecutor and the original lead case agent

represent to the Court that the government – to quote former Special Agent Gerber – simply

could not have "developed and presented this case at trial to a jury against Shelton and Forbes

who clearly led this fraud" without Mr. Corigliano's cooperation. Echoing the 5K1.1 motion,

former Special Agent Gerber notes by way of example that the government did not even know

what a "cheat sheet" was, much less have its hands on any such documents, before Mr.

Corigliano revealed their existence, pored through boxes and boxes of documents, and ultimately

found several "cheat sheets" that would be introduced at trial as among the most important

pieces of proof of the accounting frauds. The submissions further detail other instances where

Mr. Corigliano would explain the existence of a highly incriminating document at a time when

11

no copies of such a document had been located, and much later the government would find the precise piece of paper that Mr. Corigliano had described (often with his assistance).

Additionally, as the 5K1.1 motion recites, former AUSA Carney confirms what Judge Thompson experienced for excruciating days on end, and what this Court got a much smaller taste of during the third trial: the cross-examination onslaught with respect to Mr. Corigliano, including days and days of unrelenting personal assault, which former AUSA Carney describes as unprecedented in his 14 years of prosecutorial experience. The undersigned counsel, with scores of years of experience collectively as both prosecutors and defense lawyers, can confirm that, over the course of these trials, the defense's approach to challenging Mr. Corigliano's credibility was relentless and vicious and went far, far beyond what is expected and usual in even the most hotly contested cases. It included repeatedly issuing dozens of harassing subpoenas to entities and persons ranging from the Coriglianos' phone company to the banks where they kept their money to their attorneys and their personal accountant and even to Mr. Corigliano's mother-in-law. And on multiple occasions, defense counsels' efforts to unfairly attack and undermine Mr. Corigliano before the jury pushed the limits of advocacy to the point where Judge Thompson found himself forced to intervene and chastise counsel for their tactics.

4.    The Nature and Circumstances of the Offense

In these respects we largely defer to the Presentence Report, which lays out the offense conduct in detail in a number of paragraphs to which Mr. Corigliano has not objected.

Without in any way attempting to minimize Mr. Corigliano's culpability, the significant role he played in the CUC/Cendant fraud, or the fact that he supervised and directed others in carrying out that fraud – all of which Mr. Corigliano himself repeatedly has

12

acknowledged – we do wish to underscore a few facts that we respectfully submit are critical to a fair assessment of Mr. Corigliano's relative culpability.

First, as the PSR correctly reflects, Mr. Corigliano was in no sense an original "architect" of the CUC/Cendant accounting fraud. It was CFO Stu Bell who first "instructed Cosmo Corigliano" as to the principal accounting frauds. *See, e.g.,* PSR ¶¶ 14, 19, 67. By the time Mr. Corigliano replaced Mr. Bell as CFO, the various accounting frauds at CUC were "long-standing practices." *Id.* ¶21. And it was then defendant Forbes who ultimately "instructed" and "directed various of his subordinates" – including Mr. Corigliano – to make fraudulent use of merger reserves to falsely increase CUC's earnings. *See, e.g., id.* ¶11, 22, 24, 30.

Second, that Mr. Corigliano acted largely at the direction of defendants Forbes and Shelton, as well as Stu Bell, is consistent with the fact that Mr. Corigliano joined CUC in 1983, at a time when he was an inexperienced and unsophisticated 23-year-old recent graduate of Fairfield University. Prior to joining CUC, his only other experience in the business world was a short 18-month stint at the accounting firm then known as Ernst & Whinney, where he served in an entry-level position of staff-level auditor.

Third, in stark contrast to Mr. Corigliano's modest educational background and *de minimis* real world work experience, defendant Forbes was a Harvard MBA who had been running CUC for nearly a decade when Mr. Corigliano first joined the company. Forbes also was *seventeen* years Mr. Corigliano's senior. Mr. Corgliano's first direct supervisor, Stuart Bell, as well as his later direct supervisor, defendant Kirk Shelton, also were Harvard MBAs with prior business and CUC experience by the time Mr. Corigliano moved over from Ernst & Whinney to join them at CUC.

13

While none of these factors excuses Mr. Corigliano's wrongful participation in the accounting fraud over many years, they do provide some context for both understanding and judging the nature and degree of Mr. Corigliano's culpability. As Mr. Corigliano himself has reflected in his personal statement to Probation: "My superiors, especially Stu Bell, were my business idols. At the time, I considered Stu to be my mentor. And so as I was encouraged to be increasingly aggressive with the accounting policies I never stopped to consider that I was crossing the line into criminal territory." The government's plea stipulation that there is "no evidence that Mr. Corigliano" committed the accounting fraud offenses "in order to enrich himself personally" (Plea Stipulation #12) further corroborates the fundamental proposition that he was not the architect of the scheme and that it was not the allure of riches that motivated or caused him to become involved.

B.    **Sections 3553(a)(2)(A)-(a)(2)(C): Reflecting the Seriousness of the Offense, Punishment, Promoting Respect for the Law, Deterrence and Protecting the Public**

Mr. Corigliano has repeatedly acknowledged both the seriousness of his conduct and the need for punishment to be imposed, and nothing stated in this memorandum is intended to suggest otherwise. We believe, however, that the question before Your Honor is whether a non-incarceratory sentence – with strict house arrest, community service and other features the Court may devise – is "sufficient" to achieve the punitive and protective goals of sentencing in this case. We respectfully submit that the answer to this question is yes.

First, because of the extraordinary way in which this investigation has carried on, through *nine years* and three separate trials, Mr. Corigliano's fate and freedom have hung in the balance for a remarkably long time. As Terri Corigliano pointedly notes, this case has been hanging over her and Cosmo for fully half of their 17 years of marriage. Stated differently, when

14

the revelations of accounting irregularities first became public in 1998, Mr. Corigliano's oldest son David was in the second grade; now, as Mr. Corigliano finally comes before this Court for sentencing almost nine years later, David is in the eleventh grade, standing ready to graduate and move on to college in 2008. By any measure, nine years of uncertainty, including seven years of cooperation, represents an extraordinarily long time to put one's life on hold and suffer under the heavy weight of an unknown future, even in cases of cooperation.

Second, consistent with his obligations under the plea agreement to make "best efforts" to settle with the SEC, and alone among all of the former CUC/Cendant officials charged with crimes, Mr. Corigliano and his entire family have surrendered most of their assets, adding up to "an aggregate value of at least $14 million" and including "all the Coriglianos' cash and securities, all balances held by them in savings, money market, IRA, Keogh, pension or brokerage accounts, and the majority of certain funds previously held in trust for the benefit of the Coriglianos' minor children."[5]    They also surrendered Crystal Journey Candles, the small business Mr. Corigliano had built up since 1999, and that was his family's primary source of income. Significantly, the assets disgorged to the government represented an amount greater than Mr. Corigliano's unjust enrichment based on his trading in CUC/Cendant stock, without giving him credit for the substantial taxes he had paid on his gains. While the Coriglianos were left with their own residence and property (owned by Mrs. Corigliano), a house in which Mr. Corigliano's father lived since the 1960s, two old cars, and some money held in trust for the education of their children, Terri Corigliano reports the devastation of seeing "Cosmo's sense of pride totally shattered as he willingly agreed to drain every bank account of ours to a zero

---

[5] *SEC Settles With Former CFO of CUC International Inc. For His Role In Financial Fraud At CUC And Cendant Corporation*, SEC Litigation Release No. 18711, 82 S.E.C. Docket 3221, Release No. AE-2014, 2004 WL 1086015 (May 14, 2004).

KL3 25691322

balance – as if he had never made an honest dime since his graduation from Fairfield University in 1981." And as Mr. Corigliano's financial disclosures make clear, they have been forced to borrow significant sums against the family's residence and property in order to meet their day-to-day expenses and provide needed support to other family members.[6]

Third, Mr. Corigliano has been subjected to a number of additional specific and tangible punishments. As a result of his conduct and guilty plea, he has been deprived of his license to practice as a CPA; he is forever barred from serving as an officer or director of a public company; and he remains a defendant in multiple civil lawsuits exposing him and his family to continuing financial deprivations.

Fourth, Mr. Corigliano's criminal conduct has been the subject of widespread publicity, both in Connecticut and around the country. By our count, there have been close to 400 articles in local and national newspapers and magazines referencing Mr. Corigliano's involvement in the accounting fraud at CUC/Cendant. Terri Corigliano recounts the indescribable "fear and humiliation I felt when I saw the familiar C.U.C. officers' corporate photo featured in Time Magazine with a china marker circling my husband's face."

As a result of this widespread publicity, Mr. Corigliano and his family have suffered the shame and humiliation that come with public revelation that a person formerly held

---

[6] We submit that, in light of what already has been disgorged, Mr. Corigliano's current economic circumstances weigh strongly against imposing any additional financial obligations. As noted, the only material asset Mr. Corigliano currently maintains in his own name is the modest house in which his father lives. Mr. Corigliano remains the primary source of financial support not only for his wife and three minor children but also, as noted above, a significant source of financial support for both his 77-year old father and his elderly mother-in-law. His sole current source of income – his job at Crystal Journey Candles – may well come to an abrupt end depending on when and to whom the Receiver sells the company. His wife's assets are limited to their residence and property, against which the Coriglianos have over $1 million in outstanding loan/mortgage obligations, and her interest in the new company Mr. Corigliano is trying to grow, 4allpromos.com, but which has yet to turn a profit or produce any income or salary for Mr. Corigliano. And his children's only assets are moneys held in trust and designated for college tuition.

KL3 2569132.2

in the high esteem in his community has admitted to serious crimes. Again, in the words of Terri Corigliano:

> An experience like this is of course, life changing. There are no more certainties. Every single plan you thought you had all worked out changes. Everyone in your community looks at you differently – you become a pariah instantaneously. You don't get a chance to explain anything to anyone – they've already made up their mind. You're basically an outcast beyond your own backyard. As a couple with young children, you wonder about everything – where should we go – what can we do – who will believe us – what will the kids hear at school, etc. All your expectations and dreams shift course – and like an earthquake, your world drops out from under your feet and there is absolutely nothing you can do about it. I thank God that my children were young enough at the time the news broke to not have experienced the humiliation of it at the outset. People that were my closest friends less than 24 hours prior, never called, came by or phoned. We have both learned the most difficult life lessons as a result of this case on countless levels - lessons I would never wish on anyone else.

As Mr. Corigliano's brother-in-law, Mark MacNeil, succinctly puts it: "Cosmo has been living in his own hell for the last eight years."

Fifth, Mr. Corigliano poses none of the risks – of continuing danger to the community or even flight – that might render him a poor candidate for probation, home confinement and community service. Mr. Corigliano is a non-violent, first-time offender. Apart from this offense, Mr. Corigliano has led an unblemished life. His ability to practice accounting or serve in a high position in a public company has been taken away from him. His voluntary surrender in this case, waiver of indictment, payment of a multi-million dollar settlement to the SEC, and compliance with pre-sentencing release conditions demonstrate his willingness to accept this Court's authority. His long-standing and unquestioned ties and commitments to his family and community will ensure that he compliantly serves his sentence. Moreover, should

17

Mr. Corigliano violate any of the Court's mandated conditions, Your Honor would of course remain free to "revoke the sentence of probation and resentence." 18 U.S.C. § 3565(a)(2).

In sum, we submit that public federal felony convictions, nine years of uncertainty, seven years of rigorous and regularly all-consuming cooperation, and multi-million dollar disgorgement, followed by a substantial term of probation with strict home confinement, substantial community service, and other conditions the Court may set, constitutes a strong punishment and a significant deprivation of liberty. As the Probation Department itself has said, community service *alone* "addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation;" it "adds a punitive measure to probation . . . [,] restricts offenders' personal liberty" and provides "a form of symbolic restitution." *See* Office of Prob. & Pretrial Servs., Admin. Office of the U.S. Courts, *Court and Community: An Information Series About U.S. Probation & Pretrial Services* (2005)..

If sentenced to a term of probation with a condition of community service, Mr. Corigliano could begin that service promptly. The Coriglianos have been in communication with a local 501(c)(3) charity that provides 12 step programs and weekend retreats for people in recovery, St. Edmund's Retreat, and contacted its President, Father Thomas F.X. Hoar, who submitted a letter expressing his "willingness to utilize the time of Cosmo Corigliano in completing part or all of the community service component of his sentence." Father Hoar and Enders Retreat have worked with individuals fulfilling community service and former inmates in early release programs and it is Father Hoar's understanding that "a Community Service Experience would help Mr. Corigliano not only make amends but would be good for his long term positive involvement and contribution to the community."[7]

---

[7] Father Hoar's letter as well as background information concerning him are being provided to the Probation Department.

KL3 2569132.2

**C.    Section 3553(a)(3): The Kinds Of Sentences Available**

Section 3553(a)(3) now requires the Court to consider "the kinds of sentences available." The PSR correctly reflects that a sentence of probation, including one conditioned on home confinement and full-time community service, is authorized because Mr. Corigliano pleaded guilty to two Class D felonies that do not otherwise prohibit a probationary sentence.[8] Moreover, not only is such a sentence authorized by statute, but the government – at the time of Mr. Corigliano's plea – stipulated that it would not oppose a request for such a sentence should the Court decide to depart to a Guidelines level that would permit it. (Plea Stipulation #10.)

As noted above, Mr. Corigliano does not ask the Court to discount the seriousness of the conduct to which he pleaded guilty. Instead, we respectfully request that the Court consider whether Mr. Corigliano, a non-violent, first time offender, and a cooperator in a league of his own in terms of the quality and substantiality of the assistance he has provided over the last seven years, needs to be subjected now to the additional severe penalty of imprisonment when there is an alternative way for him to continue to repay his debt to society through what we submit is a reasonable alternative sentence: probation conditioned on strict home confinement, community service and other conditions that the Court may impose.

As one study by the Department of Justice's National Institute of Justice explained, community service is "a burdensome penalty that meets with widespread public approval, is inexpensive to administer, . . . produces public value" and can "be scaled to the

---

[8] *See* 18 U.S.C. § 3561 (providing that a defendant may be sentenced to a term of probation except under specified circumstances not applicable to a conviction under 18 U.S.C. §§ 371 and 1343); 18 U.S.C. § 3559 (classifying the charged violations of §§ 371 and 1343, carrying a maximum term of imprisonment of 5 years, as Class D felonies).

seriousness of crimes."[9]  A sentence like this would punish Mr. Corigliano while giving him the chance to continue repaying his debt to society.

In addition, the costs of Mr. Corigliano's potential imprisonment as measured against the gains of Mr. Corigliano's potential for community service and/or other employment weigh strongly in favor of the Court's imposition of such a sentence.  As the Court is aware, the costs of home confinement and monitoring by the Probation Department are far less than inmate prison confinement costs.  *See* PSR ¶111 (detailing costs of the average offender based on sentence type, *e.g.*, daily costs in BOP facility ($1,953), community confinement ($1,737) and supervision by probation officer ($288)).  Where probation combined with strict home confinement and substantial community service might be equally as effective and less costly than incarceration, § 3553(a) commands that such a non-custodial sentence be considered.

**D.    Sections 3553(a)(4) and (a)(5): The Sentencing Guidelines**

We do not in any way question or challenge the stipulated Guidelines calculation, which, without the benefit of any of the specific information about Mr. Corigliano's personal history and characteristics outlined above, reflects an advisory sentence of between 78 and 87 months in prison.  We do note, however, that 18 of the 28 levels that comprise Mr. Corigliano's total offense level derive from the amount of the loss – greater than $80,000,000 (U.S.S.G. § 2F1.1(b)(1)(S)) – and translate into a massive Guidelines increase in terms of months as to which the government stipulated, in light of "the nature of Mr. Corigliano's role in the offense," that "excessive weight would be attached to this factor by applying the full adjustment . . . based on that amount of loss." (Plea Stipulation #3).

---

[9] Nat'l Institute of Justice, U.S. Dep't of Justice, *Intermediate Sanctions in Sentencing Guidelines* 11 (May 1997).

KL3 2569132.2

IV.   **A NON-INCARCERATORY SENTENCE WITH STRICT CONDITIONS OF HOME CONFINEMENT AND COMMUNITY SERVICE IS APPROPRIATE, REASONABLE AND SUFFICIENT TO ACHIEVE THE SENTENCING GOALS THAT CONGRESS ENUMERATED**

Mr. Corigliano will stand before this Court having pleaded guilty to and fully accepting responsibility for very serious crimes. He readily acknowledges the need for punishment. The question this sentencing presents – consistent with this Court's mandate to impose punishment "sufficient, but not greater than necessary" to meet the specified sentencing goals – is whether, in the context of the particular facts of this case, a non-incarceratory sentence can be structured in a way that satisfies this mandate and the totality of the identified sentencing goals. We respectfully submit that the answer is yes.

Mr. Corigliano has already felt real and severe consequences as a result of his illegal actions. He has had his future on hold for *nearly a decade*, during which time, by all accounts, he has rendered seven years of extraordinary and even unprecedented cooperation. He has suffered the shame and humiliation of a widely publicized public accounting scandal, felony conviction, and countless days of vicious and personal cross-examination through three public trials in three consecutive years; he and his family have been shunned by friends and others; and he lives daily with the knowledge of the pain and hurt his actions have caused to his close-knit family. He no longer is able to get a corporate job, work as a CPA, or serve as an officer of a public company. And he has disgorged to the government the vast bulk of his family's assets, valued at some $14 million.

By imposing a sentence of probation with strict home confinement and community service and/or other employment – a sentence that the government agreed, at the time of Mr. Corigliano's plea, not to oppose if the Court were considering it (Plea Stipulation #10) – this Court can complete the punishment of Mr. Corigliano, deterring others from

21

KL3 2569132.2

committing similar offenses, and at the same time allow him to continue the critical support he provides to his immediate family (for whom he has been the principal breadwinner for all the years of his marriage) and to his father and mother-in law, and to continue to make amends to his community.

We submit that this is a case where, to borrow the words of the Probation Department, community service would be "a flexible, personalized and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective and fair – a 'win-win' proposition for everyone involved."[10]

We most respectfully urge Your Honor to sentence Mr. Corigliano to a term of probation with strict home confinement, substantial community service and other conditions the Court may impose. We submit that completing Mr. Corigliano's punishment with such a non-incarceratory sentence is appropriate and reasonable; that, along with all of the other extraordinary facts outlined above, it will add up to punishment "sufficient, but not greater than necessary" to achieve the goals of sentencing; and that it would better serve society and the family that needs and relies on Mr. Corigliano compared to the alternative of imprisoning a non-dangerous young man who could otherwise continue to make substantial contributions back to his community.

---

[10] *See* Office of Prob. & Pretrial Servs., Admin. Office of the U.S. Courts, Court and Community: An Information Series About U.S. Probation & Pretrial Services (2005).

Dated:      January 24, 2007

Respectfully submitted,

Gary P. Naftalis, Esq.
Alan R. Friedman, Esq.
Eric A. Tirschwell, Esq.
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Ira Grudberg, Esq.
Jacobs, Grudberg, Belt, Dow & Katz P.C.
350 Orange Street
New Haven, CT 06511
(203) 772-3100

23

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused the foregoing Sentencing Memorandum of Cosmo

Corigliano to be filed electronically and to be served on the following via email and Federal

Express.

> Michael Martinez, Esq.
> Craig Carpenito, Esq.
> Assistant United State's Attorney
> United States Attorney's Office
> 970 Broad Street
> Newark, New Jersey 07102
> michael.martinez2@usdoj.gov
> craig.carpenito@usdoj.gov

Alan R. Friedman

24

KL3 2569132.2