UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:02CR379(AHN) |
| | : | |
| | : | January 25, 2007 |
| v. | : | |
| | : | **FILED UNDER SEAL** |
| COSMO CORIGLIANO | : | |

**GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE UNDER
U.S.S.G. § 5K1.1**

The United States of America ("Government") respectfully submits this motion for a downward departure on the ground that the defendant, Cosmo Corigliano ("Corigliano"), provided substantial assistance in the investigation and prosecution of Walter A. Forbes ("Forbes") and E. Kirk Shelton ("Shelton").  See United States v. Walter A. Forbes, No. 3:02CR264 (AHN) (sentenced January 17, 2007); United States v. E. Kirk Shelton, No. 3:02CR264 (AWT) (sentenced August 3, 2005).  In light of Corigliano's extraordinary substantial assistance, the Government respectfully requests that this Court depart downward under section 5K1.1 of the United States Sentencing Guidelines[1] from the advisory Guidelines range of 78 to 97 months of imprisonment.

This Court currently has scheduled Corigliano's sentencing for January 30, 2007 at 10 a.m.

---

[1] All references to the United States Sentencing Guidelines are to the 1997 Guidelines Manual.

I.     **INTRODUCTION**

On January 14, 2000, Corigliano entered into a cooperating plea agreement with the Government. Little did Corigliano know that he had just embarked upon a course of cooperation that would prove to be unparalleled in the annals of white collar fraud prosecutions. During the course of the next seven years, Corigliano would: (1) meet with Government attorneys and investigators on at least 100 occasions; (2) assist three separate and distinct sets of prosecutors in learning both the fundamentals and the nuances of the accounting frauds at CUC/Cendant; (3) testify for approximately 28 days, including 19 days of unrelenting cross-examination; (4) play a crucial role in the successful prosecution of Shelton; and (5) play an indispensable role as the lone cooperating witness who directly implicated Forbes in that successful prosecution.

On June 14, 2000, exactly six months after the start of Corigliano's cooperation, he pleaded guilty to a two-count information, charging him with conspiracy to commit mail and wire fraud, and to cause false statements to be filed with the Securities and Exchange Commission, in violation of 18 U.S.C. § 371; and with wire fraud, in violation of 18 U.S.C. § 1343. The stipulations in Corigliano's cooperating plea agreement result in a total offense level of 28. If this Court were to adopt those stipulations and were to find that a criminal history category of I applies to Corigliano, then the advisory Guidelines range would be 78

to 97 months of imprisonment.  See U.S.S.G. Ch. 5 Pt. A.[2]

The facts of the offense are well summarized in the Presentence Report ("PSR"), see PSR ¶¶ 8-66, and the Government will not repeat them here in their entirety.  For the purpose of this substantial assistance departure motion, Corigliano's testimony regarding Forbes's three-part plan to continue the accounting fraud at CUC/Cendant is particularly relevant.  Third Trial Tr. at 1678-80, 1684-89, 1696, 1703-04, 1725-26; see also PSR ¶¶ 29-32.  Specifically, Corigliano testified: (1) that Forbes instructed him to build a cushion in the merger reserve large enough to cover the two years that HFS executives, Henry Silverman ("Silverman") and Michael Monaco ("Monaco"), would be running Cendant, Third Trial Tr. at 1678-80; (2) that Forbes and Corigliano discussed the need to keep the consolidation for the CUC divisions under the control of Anne Pember ("Pember") so that Forbes and his coconspirators would be able to use the merger reserve cushion without Silverman, Monaco, or the HFS side of the business detecting its use, Third Trial Tr. at 1684-87, 1696, 1703-04; and (3) that Forbes and Corigliano

---

[2] The Government mistakenly failed to advise the United States Probation Office that Corigliano's statutory maximum term of imprisonment is ten years. Unlike Anne Pember and Casper Sabatino, each of whom pleaded guilty to a single § 371 conspiracy charge, Corigliano pleaded guilty to both a § 371 conspiracy charge and a § 1343 wire fraud charge.  The § 1343 charge carries an additional five-year statutory maximum.  Accordingly, Corigliano's advisory Guidelines range of 78 to 97 months is not capped at five years under U.S.S.G. § 5G1.1(c)(1). See PSR ¶¶ 103-04.

discussed the need to keep Ernst & Young as the auditor for the CUC divisions, because Ernst & Young historically had not taken issue with CUC's improper use of merger reserves or with CUC's long-standing fraudulent policies regarding membership cancellation reserves, rejects-in-transit, and revenue recognition, Third Trial Tr. at 1687-89, 1725-26.

## II.     APPLICABLE LEGAL PRINCIPLES

Section 5K1.1 of the United States Sentencing Guidelines provides, in pertinent part, that:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines.

Id.  The decision whether to make a motion for a downward departure rests entirely with the Government.  See U.S.S.G. §5K1.1; Wade v. United States, 504 U.S. 181 (1992); see also Melendez v. United States, 518 U.S. 120 (1996); United States v. Gomez, 103 F.3d 249, 255 (2d Cir. 1997); United States v. Agu, 949 F.2d 63 (2d Cir. 1991); United States v. Khan, 920 F.2d 1100 (2d Cir. 1990); United States v. Rexach, 896 F.2d 710, 714 (2d Cir. 1990); United States v. Huerta, 887 F.2d 89, 93 (2d Cir. 1989).  The Second Circuit in Huerta observed that the question of "substantial assistance" is "self evidently a question that the prosecution is uniquely fit to resolve." Huerta, 878 F.2d at 92.  Moreover, Application Note 3 to

U.S.S.G. §5K1.1 provides that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance . . . ." Id.

Section 5K1.1 instructs that, in determining whether a sentencing reduction is appropriate, the court should consider, among other things, the following non-exclusive factors:

> (1) The court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> . . .
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a)(1)-(3), (5).[3]

## III. DISCUSSION

### A. THE GOVERNMENT'S EVALUATION OF THE ASSISTANCE RENDERED

Corigliano's cooperation in the investigation and the prosecution of Forbes and Shelton was extraordinary. Simply put, without Corigliano's testimony, the

---

[3] Section 5K1.1(a)(4) instructs sentencing judges to consider "any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance." This factor does not apply to Corigliano.

Government could not have brought the prosecution of Forbes to a successful conclusion. Moreover, Corigliano's testimony was instrumental in obtaining a conviction against Shelton.

In all three criminal trials, Corigliano's testimony clearly explained the four separate accounting frauds at CUC/Cendant, the magnitude of those frauds, and the roles that each coconspirator played in perpetrating those frauds. In the first trial, Corigliano – like Pember and, to a lesser degree, Casper Sabatino ("Sabatino") – directly implicated Shelton in the day-to-day operation of the fraud. Unlike Pember, Sabatino, or any other Government witness, only Corigliano could directly implicate Forbes as the head of the conspiracy in any of the three trials.

The impact of Corigliano's cooperation in the Government's case against Forbes is especially telling. Unlike the case against Shelton, where additional cooperating witnesses and documentary evidence directly tied Shelton to the fraud, Corigliano's testimony in the Forbes case was indispensable. Indeed, without Corigliano's assistance, the Government would have had no direct insight into Forbes's designs to defraud the investing public and HFS. It was those insights, when juxtaposed with Forbes's seemingly innocuous conduct in lobbying to keep Pember and Ernst & Young, that exposed Forbes's true criminal intent.

## B.  THE TRUTHFULNESS, COMPLETENESS, AND RELIABILITY OF ANY INFORMATION PROVIDED BY THE DEFENDANT

The information that Corigliano provided to the Government was truthful, complete, and reliable. Following his entry into a cooperating plea agreement on January 14, 2000, Government attorneys and investigators interviewed Corigliano during the course of seven years and approximately 100 meetings. The unanimous opinion of the seven prosecutors and the four investigators who conducted those interviews is that Corigliano was truthful and reliable.

This unanimous opinion is supported by a long list of examples in which Corigliano would make an uncorroborated assertion only to have subsequently discovered documents or testimony corroborate his assertion. For example, Corigliano informed Government prosecutors and investigators early in the investigation that he, Forbes, Shelton, and Stuart Bell used cheat sheets to monitor the fraudulent use of merger reserves at CUC. At the time that Corigliano made that assertion, the Government had not discovered any cheat sheets. Subsequently, however, the Government discovered cheat sheets that, on their face, tracked the fraudulent use of merger reserves at CUC.

Another example involves Corigliano's assertion that Forbes and he discussed the need to keep the consolidation for the CUC divisions under Pember's control in order to continue the fraud. During the second trial, Monaco testified for

7

the first time that Forbes attempted to persuade him to reconsider Monaco's proposal to remove Pember from the consolidation for the CUC divisions. Third Trial Tr. at 344-45. Monaco's testimony thus supported Corigliano's assertion that Forbes had intended to keep Pember in the consolidation. During the third trial, Silverman, who had not appeared in the previous two trials, testified about Forbes's extensive lobbying efforts to keep Pember in the consolidation. Silverman's testimony, like Monaco's, also corroborated Corigliano's assertion that Forbes had planned to keep Pember in the consolidation.

As a final example, Corigliano asserted pre-trial that Forbes wanted to keep Ernst & Young as the auditor for the CUC divisions, because Ernst & Young historically had not taken issue with CUC's improper use of merger reserves or with CUC's long-standing fraudulent policies regarding membership cancellation reserves, rejects-in-transit, and revenue recognition. During the second trial, the Government showed Corigliano Government Exhibit 11,007 for the first time. Government Exhibit 11,007 is a performance evaluation of an Ernst & Young accountant who worked on the CUC audit. Notwithstanding Ernst & Young's contemporaneous issuance of a clean audit opinion, senior Ernst & Young auditors disclosed in that evaluation their opinion that CUC's accounting was "inept" and "incompetent," and that CUC's interactions with the auditors were "frequently evasive," "unresponsive," and "unprofessional." Government Exhibit 11,007.

8

Once again, this document, whose significance to the Government did not appreciate until late in the second trial, corroborated Corigliano's assertion that Forbes intended to keep Ernst & Young as the auditor for the CUC divisions because of Ernst & Young's track record in not taking issue with CUC's improper accounting.

Unfortunately, before Corigliano decided to become a cooperator, he attempted to deceive Government attorneys and investigators during a January 13, 1999 proffer at the United States Attorney's Office in Newark, New Jersey. Corigliano's mistaken conduct, however, neither thwarted the Government's investigation, nor irreparably harmed his credibility before the jury. In view of the guilty verdict in the third trial, the jurors ultimately believed Corigliano's testimony that Forbes directed the fraud.

In the final analysis, the information that Corigliano provided the Government after deciding to enter a cooperating plea agreement proved time and again to be truthful, complete, and reliable. Equally important, the Government is aware of no occasion when Corigliano's information proved to be contradicted by subsequently discovered documents or testimony (with the exception of Forbes's and Shelton's self-serving and perjurious testimony).

## C. THE NATURE AND EXTENT OF THE DEFENDANT'S ASSISTANCE

The nature and extent of Corigliano's cooperation has been extraordinary. Corigliano has been cooperating with the Government in investigating and prosecuting the fraud at CUC/Cendant since he signed his plea agreement more than seven years ago. During those seven years, Corigliano has met with Government attorneys and investigators approximately 100 times, and he has testified in three criminal trials for a total of 28 days, including approximately 19 days of what fairly can be described as a free-ranging, scorched-earth approach to cross-examination. Although cross-examination regarding a cooperator's personal affairs and finances is typical, the length and the severity of Corigliano's 19 days of cross-examination was anything but typical. Notwithstanding the defense's vigorous cross-examination, the jury still credited Corigliano's testimony, and found Forbes and Shelton guilty. When Corigliano signed his plea agreement in January 2000, no one reasonably could have anticipated that his cooperation would have lasted this long or that it would have been this demanding. Indeed, the length of Corigliano's cooperation has now surpassed the bottom of his Guidelines range without any substantial assistance departure – i.e., six-and-a-half years.

Corigliano's cooperation was extraordinary, in large part, because he had to educate three sets of prosecutors, including two separate trial teams, during his

seven-year tenure. All of the prosecutors who worked with Corigliano have expressed the opinion that he was an exemplary cooperator. Each prosecutor agreed that Corigliano never hesitated to meet with Government attorneys or investigators, even though most of those meetings required Corigliano to commute two hours each way. Equally important (and equally appreciated), Corigliano displayed unwavering patience in explaining the fraud to prosecutors for whom the accounting subject matter was unfamiliar.

After Corigliano signed his plea agreement in January 2000, he met with prosecutors and investigators on approximately 100 occasions to explain the fraud and to review documents. His description of the fraud and his knowledge of the documents greatly aided the Government's understanding of the fraud's mechanics and the conspirators' designs. He and Government investigators spent many hours reviewing hundreds of boxes of documents searching for records and memoranda that described the fraud. His assistance in this regard was invaluable, as he not only identified material documents, but also detected incriminatory documents that would not have been obvious to one of the fraud's outsiders.

### D.    THE TIMELINESS OF THE DEFENDANT'S ASSISTANCE

Corigliano's assistance to the Government was timely. Generally, corporate fraud investigations start with the bottom rung of implicated employees and

proceed upward. The CUC/Cendant investigation was no different. The Government started its investigation with lower-level employees, such as Steven Speaks and Sabatino. It was only after the Government reached a preliminary understanding of the fraud's mechanics at the lower levels of CUC/Cendant that the Government proceeded to interview employees at the higher rungs of the company, such as Pember and Corigliano. This bottom-up approach to the investigation yielded typical results in terms of the timing of the criminal participants' cooperation: Sabatino signed his plea agreement in June 1999; Pember, who was Sabatino's superior after June 1997, signed her plea agreement in September 1999; and Corigliano, who was both Sabatino's and Pember's superior, signed his plea agreement in January 2000. In the end, Corigliano entered into a cooperating plea agreement within two years of the initial disclosure of potential accounting irregularities in the former CUC businesses on April 15, 1998. Given the Government's bottom-up approach to the investigation, the complexity of the fraud, and the timing of the plea agreements for Corigliano's subordinates, Corigliano's assistance was timely.

## IV.  **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that this Court grant the Government's motion for a downward departure pursuant to U.S.S.G. § 5K1.1.

                Respectfully submitted,

                CHRISTOPHER J. CHRISTIE
                Special Attorney
                United States Department of Justice

                /s/Michael Martinez
                By: MICHAEL MARTINEZ
                Federal Bar Number PHV0243
                CRAIG CARPENITO
                Federal Bar Number PHV0244
                Special Attorneys
                U.S. Department of Justice
                970 Broad Street, Suite 700
                Newark, New Jersey  07102

CERTIFICATION OF SERVICE

      I hereby certify that a copy of the Government's Motion for Downward Departure under U.S.S.G. § 5K1.1, the Government's Motion to Seal, the proposed Sealing Order, and the Sealing Envelope Cover Page will be forwarded on January 25, 2006 to:

Gary Naftalis, Esq. (via email)
Alan Friedman, Esq. (via email)
Eric Tirschwell, Esq. (via email)
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

Raymond Lopez (via email and overnight delivery)
Senior United States Probation Officer
United States Probation Office
United States District Court for the District of Connecticut
915 Lafayette Boulevard
Bridgeport, Connecticut 06604

                                  /s/Michael Martinez
                                  MICHAEL MARTINEZ
                                  Special Attorney
                                  United States Department of Justice